**MYRON'S ENTERPRISES, a corporation,**
Plaintiff-Appellant-Cross-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellee-Cross-Appellant.

**MYRON'S BALLROOM, a corporation,**
Plaintiff-Appellant-Cross-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellee-Cross-Appellant.

Nos. 74–3478, 74–3479, 75–1194
and 75–1195.

United States Court of Appeals,
Ninth Circuit.

Jan. 10, 1977.

Hugo E. Pesola, Jr. (argued), Flint & MacKay, Los Angeles, Cal., for appellant in 74–3478 and 74–3479 and for appellee in 75–1194 and 75–1195.

Leonard J. Henzke, Jr. (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellee in 74–3478 and 74–3479 and for appellant in 75–1194 and 75–1195.

Before ELY and SNEED, Circuit Judges, and S. WILLIAMS,* District Judge.

SNEED, Circuit Judge:

Taxpayer-corporations sued in district court below for a refund of accumulated earnings taxes imposed by the Commissioner.[1] The Commissioner had based the tax on his determination that for taxpayers' fiscal years 1966 through 1968 the reasonable needs of the business stemmed entirely from working capital needs and never exceeded $21,272. The taxpayers contended that their retained earnings for the years in question of $316,000, $374,316, and $415,766 respectively were needed to cover both working capital requirements of $100,000 and the planned purchase and remodeling of the ballroom operated by taxpayers, at an estimated cost of $375,000.

The district court, in *Myron's Ballroom v. United States*, 382 F.Supp. 582 (C.D. Cal. 1974), held that taxpayers had accumulated earnings in excess of the reasonable needs of their business, but not to the extent claimed by the Commissioner. The court also found that the taxpayers had been availed of for the purpose of avoiding income taxes. Thus, the court upheld the surtax, but required a partial refund in light of the Commissioner's underestimation of taxpayers' reasonable business needs.

The taxpayers argue on appeal that they are entitled to a full refund (i) because all of the retained earnings in the years in question were required to meet the reasonable needs of their business, and (ii) because they proved by the preponderance of the evidence that they were not availed of to avoid taxes, despite the contrary finding by the district court. The Government argues, in response, that taxpayers were not even entitled to a partial refund—that the Commissioner's initial determination of the reasonable needs of the business was correct and that taxpayers failed to prove lack of tax-avoidance motivation.[2] We conclude that the taxpayers are entitled to the full refund they seek. Therefore, we reverse and remand for such necessary proceedings as are consistent with this opinion.

I.

Taxpayer-corporations operate a ballroom and adjoining cocktail lounge. At all times since taxpayers were formed, they have leased their operating premises from Miss Pearl Rose, an elderly lady who has owned the property for approximately 30 years. The taxpayers began inquiring into the possibilities of purchasing the property in 1957, in part because they did not wish to make needed improvements unless they owned the building. Taxpayers made offers to Miss Rose of $100,000 and $150,000

---

* Honorable Spencer M. Williams, United States District Judge for the Northern District of California, sitting by designation.

1. I.R.C. §§ 531–537 place a surtax on corporations "formed or availed of for the purpose of avoiding the income tax . . . by permitting earnings and profits to accumulate instead of being divided or distributed." I.R.C. § 533 provides that a corporation will be presumed to be so formed or availed of if "the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business"; the taxpayer can only overcome this presumption by proving the contrary by a preponderance of the evidence. The surtax is placed on "accumulated taxable income," defined by I.R.C. § 535 as, with minor modifications, any taxable income retained beyond that required for the reasonable needs of the business. Thus, if all the retained earnings are required to meet the reasonable needs of the business no surtax can be imposed.

2. The varying contentions of the parties as to whether the taxpayers' accumulation of income was justified by reasonable needs are well contrasted to the district court's findings by the chart in Appendix A.

for the property in the late 1950s—early 1960s, neither of which was accepted. However, at the time of the second offer, Miss Rose told taxpayers that they would have "first choice" if and when she decided to sell the ballroom.

In 1963, taxpayers learned that Russ Morgan, a former orchestra leader at the ballroom, had offered Miss Rose $300,000 cash for the property, in an attempt apparently to take over the ballroom operation. The price offered by Morgan probably reflected the goodwill that taxpayers had built up in their operations and therefore was considerably higher than the value of the ballroom property by itself. Morgan's actions convinced taxpayers that their business could be involuntarily "acquired" by someone purchasing the ballroom from Miss Rose;[3] taxpayers, therefore, promptly offered Miss Rose the identical sum of $300,000. This offer was renewed in 1964, 1965, 1966, 1967, 1968 and 1970. While Miss Rose never objected to the terms of the offers, she never sold and still owned the ballroom at the time of trial.

As the Government points out, Miss Rose was never particularly clear as to when and if she would sell her building. Nevertheless, the district court found (a) that taxpayers "expected at any time during the years 1966, 1967 and 1968 that [they] would be able to purchase the ballroom property from Pearl Rose for a price of $300,000 cash, no less than that amount, and maybe more," 382 F.Supp. at 587, and moreover (b) that the "expectation that the ballroom property would be acquired at any time during the years in issue was a reasonable expectation," id. at 588. Thus,

During the years in issue, the acquisition of the ballroom property and the planned improvements and repairs were reasonably anticipated business needs of [taxpayers], and said needs were directly connected with the businesses of the corporations." Id.

The district court further concluded that "[c]onsidering the reasonably anticipated business need of the corporations to purchase the ballroom property . . . the corporations combined required at least $375,000, in addition to their combined working capital needs of $100,000." Id. However, the court went on to hold that in light of taxpayers' sole-shareholder Mrs. Myrna Myron's willingness to loan up to $200,000 to her corporations for purchase of the ballroom "if the corporations did not have sufficient funds to consummate the transactions, . . . a reasonable accumulation [for the purchase] would be $250,000, with Mrs. Myron loaning the balance of funds required," id., thus leading to an excess accumulation in 1967 and 1968.

## II.

Section 537 of the Internal Revenue Code provides that the reasonable needs of a business, for purposes of determining whether there has been an excess accumulation of earnings, include "the reasonably anticipated needs of the business." Treas. Reg. § 1.537–1(b)(1) provides that to justify an accumulation of earnings on grounds of reasonably anticipated business needs, a corporation must have "specific, definite, and feasible plans for the use of such accumulation" and must not postpone execution of the plan "indefinitely."[4]

---

3. While taxpayers had a lease and an option to renew on the ballroom property at the time Morgan made his $300,000 offer to Miss Rose, there was always the possibility that the lease could be broken or evaded. According to Mrs. Myron, Morgan had asked his attorney and Miss Rose's agent "to review [the lease] line by line to see if there was some way or some word—something that could break the lease." R.T. at 73. This possibility of a loophole in the lease left the door open for an involuntary "acquisition."

4. In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depend-

The Government contends that the district court erred in concluding that the taxpayers had a "specific, definite, and feasible plan" to acquire and remodel the ballroom. The Government notes that Miss Rose never agreed to sell the ballroom and argues that taxpayers could not have reasonably expected Miss Rose to so agree within the taxable years in question after nearly a decade of unsuccessful negotiations.

We agree with other circuits that a determination by the trial court of the reasonably anticipated business needs of a corporation is a finding of fact which must be sustained unless clearly erroneous. *See Atlantic Commerce & Shipping Co. v. Commissioner of Internal Revenue*, 500 F.2d 937, 939–40 (2d Cir. 1974); *Bahan Textile Machinery Co. v. United States*, 453 F.2d 1100, 1102 (4th Cir. 1972); *Oklahoma Press Publishing Co. v. United States*, 437 F.2d 1275, 1277 (10th Cir. 1971); *Nemours Corp. v. Commissioner of Internal Revenue*, 325 F.2d 559, 560 (3rd Cir. 1963). A court should be particularly wary of overturning a finding of a trial court *supporting* the taxpayer's determination of its anticipated business needs, since, in the first instance, the "reasonableness of the needs is necessarily for determination by those concerned with the management of the particular enterprise. This determination must prevail unless the facts show clearly the accumulations were for prohibited purposes." *Henry Van Hummell, Inc. v. Commissioner of Internal Revenue*, 364 F.2d 746, 749 (10th Cir. 1966), *cert. denied*, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (1967). We conclude

that the district court was not clearly erroneous in finding that taxpayers' expected purchase and remodeling of the ballroom for $375,000 was a "reasonably anticipated need of the business."

The Government argues that if the instant plan to purchase the ballroom is held to be a reasonably anticipated business need,

"any individual could organize a one-man corporation, lease a building and discuss with the lessor the purchase of the building at some future time, and then assert that in the meantime business needs required accumulation of corporate earnings." *I.A. Dress Co. v. Commissioner of Internal Revenue*, 273 F.2d 543, 544 (2d Cir.), *cert. denied*, 362 U.S. 976, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960).

Such fears of artificially constructed needs were well-founded in the quoted case of *I.A. Dress Co.;* there, the owner of the building that the taxpayer sought to purchase "was willing to sell but at a price some $300,000 more than the taxpayer was willing to pay." *Id.* The offer of the taxpayer lacked substance and could easily have been a facade. In the instant case, however, the taxpayers were extremely diligent in their attempts to purchase the ballroom; the taxpayers agreed to all of Miss Rose's stated terms—including payment in all cash; the price offered, far from being criticized by Miss Rose as too low, was apparently in excess of the property's fair market value.[5]

ing upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business." Treas. Reg. § 1.537–1(b)(1).

5. The Government argues that in addition to these steps the taxpayers also should have investigated purchasing other property in the general area, once Miss Rose did not prove totally disposing. *Cf. Magic Mart, Inc.*, 51 T.C. 775 (1969), *acq.*, 1969–2 C. B. xxiv. We agree

that the failure of a taxpayer to look into the possibility of purchasing alternative properties generally will be a relevant factor in determining whether the taxpayer actually had a reasonably anticipated business need to purchase the sought-after property. However, other factors also must be considered, including the *uniqueness* of the sought property. Here, as was testified to at trial, a substantial amount of good will was tied up in the ballroom occupied by taxpayers; given that this value would have been lost if taxpayer had moved to another location, we do not believe that taxpayers' failure to pursue other possible properties (if other ballrooms even existed) calls for reversing the finding of the district court.

Neither do we have a situation where taxpayers' planned purchase of the ballroom was clearly infeasible. *See Colonial Amusement Corp.,* 1948 Tax.Ct.Mem.Dec. (P–H) ¶ 48,149 (building restrictions and priorities prevented carrying out of expansion plans). Here, as in *Universal Steel Co.,* 5 T.C. 627 (1945) (war priority restrictions temporarily blocked purchase of pickling plant), the taxpayers "had a right to hope, if not expect," *id.* at 638, that Miss Rose would sell to them in the near future. Miss Rose never foreclosed the possibility of sale on the terms offered by taxpayers; she merely wanted to "think it over some more." As expressed by Miss Rose's agent at one point during the negotiations, Miss Rose "was an elderly lady and had a very definite mind"; her answers, according to the agent, would differ depending on how she felt on getting up in the morning. Taxpayers were encouraged at several points in the negotiations; in 1965, Miss Rose's agent had told taxpayers, "Be prepared and ready to go." In light of the reasonable possibility that Miss Rose might have decided to accept the offer at any time during the taxable years in issue, calling for quick collection of $375,000 in cash, it would have been unreasonable to force taxpayers to pay out all of their earnings in dividends. Section 537 allows taxpayers to provide for "reasonably anticipated needs," not merely for certainties.

The district court's finding is supported by several tax court cases. In *Magic Mart, Inc.,* 51 T.C. 775 (1969), *acq.,* 1969–2 C.B. xxiv, the Tax Court held that the taxpayer's accumulation of earnings for 1959 through 1962 was reasonable in light of taxpayer's plan to acquire enlarged and expanded facilities, even though it had tried unsuccessfully to buy larger facilities since 1957 and was not able to close a deal until 1967, five years after the taxable years in question. In *Breitfeller Sales, Inc.,* 28 T.C. 1164 (1957), *acq.,* 1958–2 C.B. 4, the Tax Court held that a General Motors dealership's accumulation of earnings was justified, *inter alia,* by "the continuing *possibility* that it might [to avoid harmful competition] be required to finance a new dealership in [a neighboring community]." *Id.* at 1168 (emphasis added). *See also Universal Steel Co., supra.*

### III.

■■ The Government rests its entire case upon the argued lack of a specific, definite, and feasible plan. No attempt is made to support the trial court's use of Mrs. Myrna Myron's capacity to loan to the taxpayers to reduce the amount of the reasonable accumulation. The Government thus agrees with taxpayers that, assuming a feasible plan, the district court, in determining whether taxpayers unreasonably accumulated earnings, erred in subtracting from the cash needed to purchase the ballroom an amount that Mrs. Myron stated that she would be willing to loan to the taxpayers *if necessary.* We also agree. Having found that the reasonably anticipated business need of the taxpayers to purchase the ballroom property required at least $375,000 in cash, the district court erred in concluding that a reasonable accumulation was any less.[6]

6. That the reasonableness of accumulations should be judged without regard to the borrowing capabilities of the corporation-taxpayer is well established by the case law. *See, e.g., General Smelting Co.,* 4 T.C. 313, 323 (1944), *acq.,* 1945 C.B. 3; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 8–20 to 8–21 & n.42 (3rd ed. 1971). In computing "accumulated taxable income," which forms the base for the accumulated earnings tax, I.R.C. § 535 provides that a credit will be provided for the amount "retained for the reasonable needs of the business." There is no authority for reducing the credit to reflect the lending capacity of taxpayer's shareholders. If the reasonable business needs of taxpayer equal or outstrip the retained earnings, no surtax can be imposed, even though the needs could be financed by borrowing from outside—such financing decisions are for the taxpayer, not the courts to make.

The district court's logic could conceivably be extended to the point of totally nullifying Congress' expressed policy of allowing corporate taxpayers to accumulate earnings necessary for reasonable business needs. A sole shareholder can always loan back any cash distributed by his corporation in dividends if the corporation later needs the money (minus, of course, any income taxes paid). Therefore,

Having determined that the reasonable business needs of taxpayers, within the meaning of section 535, equalled or exceeded the accumulated earnings of taxpayers for the taxable years in question, it is unnecessary for us to consider whether the district court was correct in holding that taxpayers had been availed of to avoid taxes within the meaning of section 531.[7] Taxpayers are entitled to a full refund. The case is remanded to the district court for such necessary proceedings as are consistent with this opinion.

REVERSED AND REMANDED.

APPENDIX "A"

| | 1966 | | |
| | Court | T/p's | Govt. |
| --- | --- | --- | --- |
| Retained earnings | $316,030 | $316,030 | — |
| Net liquid assets | — | — | $278,744 |
| Less. | | | |
| Operating expenses (working capital) | $100,000 | $100,000 | $ 13,290 |
| Anticipated business needs (building) | $250,000 | $375,000 | — |
| Amount available for distribution as dividends | — | — | $265,454 |
| | 1967 | | |
| | Court | T/p's | Govt. |
| Retained earnings | $374,316 | $374,316 | — |
| Net liquid assets | — | — | $334,978 |
| Less: | | | |
| Operating expenses (working capital) | $100,000 | $100,000 | $ 15,709 |
| Anticipated business needs (building) | $250,000 | $375,000 | — |
| Amount available for distribution as dividends | $ 24,351 | — | $319,269 |
| | 1968 | | |
| | Court | T/p's | Govt. |
| Retained earnings | $415,766 | $415,766 | — |
| Net liquid assets | — | — | $384,470 |
| Less: | | | |
| Operating expenses (working capital) | $100,000 | $100,000 | $ 21,172 |
| Anticipated business needs (building) | $250,000 | $375,000 | — |
| Amount available for distribution as dividends | $ 65,765 | — | $363,298 |

(N.B.: In determining whether taxpayers retained income beyond the reasonable needs of their business, the district court and taxpayers looked to "retained earnings," while the Government contends that net liquid assets is the more relevant figure. The Government's position actually is more favorable to taxpayers than taxpayers' own.)

to take into account the ability of a shareholder to loan money to the corporation could be construed as virtual authority "for denying all sole stockholder corporations the right ever to maintain accumulations even for reasonable needs. The test expressed by the statute would then be completely abandoned." *Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue,* 241 F.2d 197, 206 (4th Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957).

**7.** The Government, before oral argument, withdrew its attack on the district court's computa-

tion of working capital, recognizing that, if the district court was correct in concluding that the reasonable business needs of taxpayers included $375,000 for their planned purchase of the ballroom, this justified taxpayers' accumulation of earnings for the years in issue. *See* Appendix A (net liquid assets of taxpayers for 1966–1968 never exceeds $375,000 plus Government's $21,172 estimate of working capital needs). Therefore, we do not consider the issue of whether the district court was correct in its determination of the working capital needs of the taxpayers.